Good morning, everyone. We have six arguments on today's calendar. We'll begin with Appeal No. 23-1175, Edgewood High School v. the City of Madison. Mr. Stratton, good morning. Good morning, and may it please the Court. There is no dispute that the City of Madison treated Edgewood High School differently from other schools with the same zoning classification. The City prohibited Edgewood from using and lighting its field to the same extent as other schools zoned Campus Institutional District. I'm not sure I agree with that first sentence that you uttered because Edgewood, when the new zoning classification, Campus Institutional, was instituted, chose to put together a master plan, and some did and some didn't. I gather that the point of the ordinance was to alleviate some of the burdens that the status quo ante had imposed for conditional use permits. So maybe some people thought, ah, we'll live with the burden and other people didn't. But I'm not sure that Edgewood was treated differently from anybody else that had a master plan, for example. Well, I think there's two points that I'd like to make on that. First, with respect to the field use, that was an existing use. Edgewood has had a field since 1923. And Edgewood can still use its field. Well, Edgewood was prohibited under the... No, they were using their field. When you say field use, you are actually saying nighttime field use. No, Edgewood, under the Campus Institutional District Ordinance, which went into place January of 2013, established as as of right that any high school, including Edgewood or the public schools, had a right to use their athletic fields for athletic contests and other activities related to their primary mission. That's where the master plan comes in. No, that's just the CI District Ordinance that predated the master plan by at least a year. So what ended up happening is, under the CI District Ordinance, there was no restriction on when you had a right to host athletic contests. There was no limitation on day or nighttime uses. So Edgewood had, going into the master plan, an existing right to use its field at night, just like all the other public high schools. This wasn't some type of... No, I understand that, but the point here is that Edgewood chose to describe the uses that it was currently having for that field as team practices. The actual quote is, used for team practices, physical education classes. And the question then becomes, is what you're now doing an expanded use? And my understanding of the record is the city never bothered you about daytime uses. They said, well, maybe this is a technical problem, but we're not going to do anything about it. Well, no. By choosing to identify examples of how the field was used, that's all Edgewood was doing. The master plan had nothing to do with the field. The master plan was put together to get a consolidated, expedited review. Well, it had everything to do with all of what Edgewood was doing. Let me ask you this question. Suppose Edgewood had been one of Madison's public schools, not a parochial school, and everything else that happened happened. Same master plan, the same district, because obviously the ordinance applies to both public and private entities. We know this from the University of Wisconsin, for example. Wouldn't everything be the same? The city would have done the same thing? I'm having a huge amount of trouble discerning any element at all of hostility to religion or different treatment of religion. Religion seems so beside the point to me in this case that I need some help from you to show where it is. Sure. There is no requirement, either under the substantial burden provision or the equal terms provision, to prove religious animus. If we have that evidence, it certainly helps. How about even difference of treatment because of religion? There has to be a causal connection. No. All the equal terms provision provides is that a religious institution must be treated on the same terms as a non-religious institution. Sorry, Your Honor. I'm not really getting this point across well. You, I believe, think that it's actually not permissible to treat religious institutions differently, even if there are different facts, even if there are different things. All you have to do is say we're religious, and then you're exempt from all laws, it seems like is your view. That's not my view at all. The Reaver of Life equal terms test asks equal with respect to what? The campus institution. And you don't think there needs to be any connection to the religious character of the school. It could be religious, non-religious, you know, anything. No. I mean, in order to make the claim, the institution has to be religious. No, but where does the religion come in to the actions taken by the governmental entity? If you can show that a religious institution is not being treated equally, you don't need to establish proof of malice or targeting or anti-Catholic animus behind the decision. It can be inferred from the fact that you have a set of standards that apply to the public schools that don't apply to the Catholic school. Is there any other Catholic school in Madison? That's the only, this is the only Catholic high school in the campus institutional district. So that's why it's, the relevance is this is the only Catholic high school. It was rezoned campus institutional district, just like the public high schools. They enjoyed all the same land use rights. They enjoyed the same right to put in lights if they satisfied Madison's generally applicable and technical outdoor lighting ordinance. What changed is that all of a sudden Madison decided that Edward had somehow forfeited all of its existing rights. This is not a new institution trying to establish itself. This institution dates back to 1881. It's had its field since 1923. And for the city of Madison to come to Edward and say, you've actually lost your right to host athletic contests. Is that the right that you think has been lost to host athletic competitions? That's not the right. No, it's the right to use our field in accordance with what the rights that were already permitted. Use your field when, where, and how? Just like all the public high schools. No, no, no, no. That's not a good answer. At what time? In what ways? All day long? 24 hours a day? You could host a football game at 3 a.m.? What are you actually complaining about? Because sometimes when I'm reading your brief, I think you're making kind of a hypothetical complaint about something that Madison wasn't stopping you from doing, despite the language of the master plan. That is to say, hosting athletic contests during the daytime with no lights. Sometimes I think you're complaining about your inability to get the lights built and used. It's very unclear. The standard by which we are seeking equal treatment is the Campus Institutional District Ordinance, which set forth the permitted uses. That was all identified. In other words, we have the right to use our field at night, to use our field during the day, under the CI District Ordinance. Can I ask the same question a different way? Sure, please. Because I don't know that I even understand the unequal terms claim. I don't know what you're arguing. And I think I've read both briefs twice. I can't figure out what you're even claiming. Okay? So it seems to me that the clearest articulation of it comes on page 31 of your blue brief. And on page 31 of your blue brief, as Judge Wood is questioning you, you seem to say that the unequal terms violation that you allege here has two dimensions to it, that yes, they relate at some level, but they are independent. The first is using the fields for games. Okay? Yes. You say it. I mean, right directly on page 31. And the difficult, as a freestanding claim under that provision. And then, but in your reply brief, at least twice, you come right out and say, but we've always been able to use the field for games. So what I don't understand is, if you have a claim that you were prohibited from using the field for games, but then in the next breath you say, we've always used the field for games, how do you have standing? No, it's because that's what the notice of violation said we couldn't do. By stating that we had always had the right, it's an existing right that they. You never stop. It seems like past tense, you use the field for games. Correct. Present tense, you use the field for games. Future tense, you plan to continue to use the field for games. So how is it that the city of Madison has done anything to preclude you from using the field for games when that's exactly what you've done? No, that's what the city did in 2000 when they issued the notices of violation, which barred us from continuing to use the field for games, which forced us. And your representation is that you stopped using the field for games? No, because we had to appeal to the ZBA. We appealed to the Zoning Board of Appeals. We lost that appeal, and then we had to, in order to regain the right. So what's the injury? The injury is all of the expenses, the time, the uncertainty, the lost donations, the reputational harm for the city to apply a separate standard to us that wasn't applied under the CI district. This is what ended up happening was that. Okay, now that sounds to me like a claim that we've been given the runaround. It sounds like a due process violation. Maybe you don't make a takings claim, but I think that what you're arguing is that the unequal terms provision of the statute has been violated. And it was. So how do you have standing? We were harmed. The notices of violation and the Zoning Board of Appeals affirmance of that. But you never stopped. I mean, you say in your brief several times that when you went to the city, they said, don't worry. Apart from this lighting controversy, which is a different aspect of this case, that's item two on this page 31 list, the city said, don't worry about it. We're not going to do anything with these notices. And you kept on holding games there. You never stopped having games. But we had to incur cost and we were harmed. No, I don't want to hear about that right now. First, you never stopped holding games, correct? There were games held after the notices of violation. Right. So you never stopped holding games. We can have a discussion about the bureaucratic expenditures that you were put to, which is not really an equal terms problem, it seems to me. And usually there are all kinds of people who fight zoning ordinances. Sometimes a zoning ordinance will say this used to be acceptable for light commercial use, but now we're going to zone it exclusively for residential. And people might oppose that, or somebody might want to build a church or a mosque or something, and they have to work at it. But if the city has a provision to allow them to do so, then the fact that it's allowed is the important thing. I don't know where in the law you find a right not to have to use the procedures that the city makes available to you. Well, that's much like the World Outreach case. So the city of Chicago in World Outreach imposed permitting requirements that shouldn't have been imposed on World Outreach. This is the same situation. The city interpreted the master plan to bar us from hosting athletic contests on our athletic. But they never stopped you from doing so. That's right, yeah. Do you agree that your equal terms claim that you're trying to allege here based on use of the field is all pre-termination of the master plan, that once you terminated your master plan that you could no longer argue an equal terms claim based on use of the field? Right, but for the fact that there's damages that were caused by the So when the master plan was in place. Yeah, both sides. I just want to clarify because your briefs are not crystal clear on this. Your equal terms claim, as Judge Scudder pointed out, you have two prongs to it. One is use of the field. The use of the field aspect is limited to the time when you had your master plan in place. Both sides agree that after the master plan went away, then the city's faux obstacle to us hosting athletic contests, the equal obstacle, was gone. So then we were now being treated on equal terms with the public high schools. But until the city's interpretation was removed, which they wouldn't do unless we repealed the master plan, we had to go through all the cost, expense, and uncertainty of suffering under the city's faux interpretation of our master plan. That's the harm. So to address your honor's standing requirement, we were harmed by the fact that the city took the master plan, abused it and reinterpreted it to treat it basically as a waiver of our existing rights. So your argument is that you had everything under the CI plan, district ordinance, plus whatever you had in your master plan. Yeah, a master plan supplements the CI district. That's what it does. The CI district sets forth the baseline standard and is the accepted zoning criterion by which you determine whether a use is permitted or not permitted in the CI district. The master plan didn't change that. Okay. And you see what you're saying in the courtroom today. You see that as an, as an equal terms claim. Yes. As opposed to a dupe. I mean, as opposed to due process or takings or something else. No, because I believe that the standard, again, the accepted zoning criterion asked the key question equal with respect to what the river of life cases clearly says that it's a religious institution is entitled to be treated with respect, equal with respect to the accepted zoning criterion and gave examples, commercial district, residential district, industrial district. Here, the accepted zoning criterion was campus institutional district. Our claim is that we were entitled at all times to be treated on equal terms with respect to the CI district. So what's your answer to the city's argument that under this campus institutional new sort of district, it was going to be driven by these master plans, which themselves were enacted into law by the city of Madison. So, you know, you could get rid of it. They could repeal it, but it was supposed to allow for kind of a cooperative public private  field. At the university of Wisconsin took advantage of these things. A lot of districts, you know, a lot of entities may have thought it just wasn't worth the trouble to draft a master plan. You did though. And while it was in effect, it was the measure of what you had in your deal with the city to do. That's what the city argues in any event, right? The city reads it far too broadly. A master plan. I mean, why can't they read it? Literally you said, this is what we're using the field for. No. Thankfully, the city even concedes in their response brief at page 29 that it was based on an inference. In other words, we had a picture of our athletic field. It was labeled athletic field. They didn't think that that was sufficient enough to identify that we're going to continue to use it for athletic contests. And then underneath it says team practices, physical education classes. And then they said, well, that was sufficient for us to infer that that's all that Edgewood would, was going to be using. If that's where you're hanging your hat, that's where I go back to what judge St. Eve was talking about. They never stopped you from having athletic contests. Never. May I save the. Yeah, we're going to give you some time. This is the records confusing here. Very confusing. I have another question. I have one. Let me. Here's what really surprises me. Sure. That you're focused on. A use of property that you never stopped engaging in. As opposed to the denial of the permission to put the lights up. I, I really thought that we might come in the courtroom today and you would say, forget the games practices distinction, forget it, ignore it. What my client is really looking to do is put lights up at the field. And that is at the heart. Of our unequal terms claim. But you haven't said a thing about lights. I was trying to address your honor's questions as to the use issue. And yes, we maintain our lights claim and we believe that was unequal treatment as well. Is that what you care most about? Well, now that now that we have the right to host games, we, that is what we can never, what do you mean? Right? You never stopped. Nope. We were denied that right to harm to the school. How were you denied it? There is absolutely zero evidence. That you were denied the use of your field. When you had a game scheduled. I don't see how you could stand here and make that argument. There's no claim. For example, that the police padlocked the field. No, we were threatened. We received the notices of violation and threatened with penalties under the ordinance.  May I reserve the. You may. Can I, I know we could give you extra time. Okay. Before you go away, I want to shift real quickly to the substantial burden claim. Because I don't understand what you're precisely claiming was your religious exercise at issue there. Sure. Our religious exercise. You look at the particular religious exercise. The institution has religious purposes for why it needs to use the field at night. We laid those out in our brief. So in other words, we use our field for community and partnership development, development activities. And in order to attract students to the school, that is what the religiously motivated land use is. And under the religious land use act, you focus on the particular exercise that's being denied. Students are in school all day. Parents are at work all day. We need to be able to use our soul field as a place for, we can develop community and partnership. Can you, can you go back to judge woods question then. Couldn't the public high school say exactly the same thing. In terms of, in terms of when I, when I read the declaration of president Elliot, It's he's, he's saying what you're saying that we need the field at night to develop a sense of community. It brings students, parents, and community, and members of the community together. Public schools can say exactly that. And they haven't enjoyed, and they have been using their field. The CI district ordinance allows that. How's that Ted? What's the nexus to the religious mission? Well, that's an, it's integral to the, the religious mission of edgewood is to form the whole student, my body, mind, and soul. Catholic students are not just formed in the classroom. They're also formed on the field. And we have established just like the world outreach case in which the court said that souls aren't just saved in church. And it recognized that world outreach is Recreational services were a key part or integral part of world outreach, accomplishing its mission. The same way is limiting principle and that, that is such a broad statement that you could claim you need anything for the use of the field in order to achieve that goal. No, the limiting principles there are both the sincerity of the religious institution, which is a jury question, but there's also, no, it's not, we don't peel back claims by religious institutions and ask if they're sincere, unless it's something preposterous like a prisoner saying that he needs filet mignon twice a week, you know, or something. And one has seen those cases, but in general, that's precisely what we do not do. So if a religious institution says our religion includes, you know, like the felon gong people, you know, exercising every morning. Okay, fine exercise every morning. But, but I'm searching for a limiting principle too, because I, I don't see what any of this has to do with Edgewood's religion. I think it has everything to do with wanting a well-rounded program, everything to do with, you know, hoping that it can use the field at night, you know, which is a familiar sort of problem. I cannot see a religious dimension to it because I can't see how any of this would have been different. If instead of this being Edgewood, it had been Madison West, for example, a major high school in Madison. And that goes to the sincerity of the institution. If this doesn't, it just goes to whether it has not everything that a religious institution does is religious. They hire janitorial services to empty the wastebaskets. That's not a religious act. It's just maintaining a building. And the line by which a religious exercise, you know, growing a half inch beard becomes religious or secular is frankly up to the claimant under the statute. And it's the substantial burden test has to be more than just a, essentially a judicial Rorschach test. So what, another limiting principle to your honor's question is the fact that if it's just a mere inconvenience on the institution, then, you know, then it could be dismissed as not substantial. But so long as there's a scintilla of evidence upon which a reasonable jury could find the burden to be substantial, the jury should be allowed to be substantial here. Then when you have access to other fields at night, well, the religious, as we pointed out in our brief, the religious land use act protects the religious institutions, right? To use its own property in accordance with its religious mission. That was what the holding wasn't saints Constantine. That's what the holding was in world outreach case. And if the religious land use act was read to allow a municipality, the size of Madison or Chicago to defeat at any claim by stating, well, we know we're prohibiting you from using your own land, but we have a conference room in our city hall that you can have your mass, or we have a city field that you can use from time to time. You don't get priority. You may be bumped, but take all your students over there. And it may change. The same thing happened to the public high schools, by the way, there are a number of public high schools in Madison that also do not have their own field who are exactly similarly situated to you. Well, they're not similarly situated in the sense that they don't have rights under the religious land use. Institutionalized institutionalized versus being treated the same as them. Yes. And I'm only addressing the substantial burden claim. Okay. We'll give you some time on rebuttal. Thank you. Yep. You're welcome. Okay. We'll hear from the city. May it please the court. My name is Sarah Zylstra. I along with my colleague, Tanner Jean-Louis represent the appellees in the case, which consists of the city of Madison and related entities. Would you mind starting by doing a quick overview of at least the city's position on how this campus institutional district and the master plans work and how they either are something that build on the preexisting zoning framework or something that's a substitute. Well, as this court has recognized the campus institutional district ordinance came into being because some of the educational education and medical institutions wanted a cleaner, clearer path to getting their projects through the city. Edgewood prior to the CI district ordinance going into effect was zoned residential. That means for anything it wanted to do on its campus, it had to go through the conditional use process, which is an expensive time consuming process. The purpose of the master plan was to try and basically identify 10 years worth of projects and to try and get those past all at once. Now with with the conditional use process that allows neighbors and city residents to come for each project to make their positions known and whatnot. So the master plan's idea was to have the institution meet with the neighbors and neighborhoods and try and get compromise for the 10 years worth of projects. So that's the stage at which there was public input. The institution would say, we're crafting a master plan, come to a meeting, correct? And the actual CI district ordinance indicates right up front that in several places that it was important to have neighbor input in your master plan, your master plan. If you, if you did not have any neighbor input, it was very unlikely it would have ever passed the city council, which is what needed to be done. We're in the text of this ordinance. Does it support a restrictive reading of the master plan? You've argued in your briefs that if you look at the plain text, that that supports your argument, that the master plan itself is restrictive as opposed to permissive. Correct. Your honor. But where, what particular language in the ordinance supports that? It's two provisions. It's a section 28.097 sub five. And it is a combination of that subsection and 28.097 sub 10. So what sub five says is what the contents of your master plan must be. And the master plan must include not only your existing uses, but your proposed future uses during the 10 year period of the master plan. And it's very, it's very detailed. It includes land uses in buildings. It include natural features. It includes open spaces. But what about that particular language suggests that it supersedes existing rights at the time that they entered in? So, uh, so five identifies that you have to identify these things in your master plan. 10 says that these things means the things that you are now doing or that you're playing both. It has a section for existing conditions and uses and future uses and capital improvements, open spaces there. They are listed both as existing and future uses that you have to identify. Subsection 10 then says that you cannot alter your master plan. And it says importantly, including changes to the proposed use of identified open space areas, um, shall be permitted unless approved by the plan commission. It then provides that if it's a minor alteration, but then the zoning administrate might be able to approve it. But if it's the, if the change or addition constitutes a substantial alteration of the original plan, then it says the procedure in 28.0976 is required. What that procedure is is basically the approval of the master plan. So you can amend your master plan, but it has to go through the approval process, which again, uh, was, and if you think about it, it only makes sense, right? Because, uh, what the, what the city is trying to do is balance the vitality and the, the neighbor's interest versus development's interests. And so this process brought them both together. And then the master plan becomes a, an ordinance that if you want to change would have to go through the, is there any, is there any hybrid arrangement available? So say for example, something very unexpected happened that required a capital improvement. And you said, well, it's unexpected. So by definition, we didn't know what to put it in our, in our plan, but what we would like to do is go through the, the conditional use permit process with respect to that. It would not go through the conditional use. It would go through the amendment to the master plan process, which is similar to the condition. Is there a way for that to all be expedited to deal with a, an emergency capital improvement, for example, like the boiler goes out and you say, well, we want to move away from steam heat. The city has obviously would have to put notice out for that, but they could certainly do that and do that on an expedited basis. And the important thing here is Edgewood actually filed to amend their master plan. Uh, they wanted to add lights in a stadium and the city had said, Hey, we think your use is not right in your master plan. Add that to, to your amendment. Let's just take care of all of these things at one time. Edgewood proposed that amendment to the master plan and then decided not to go forward. Can I ask you the favor of, um, kind of in keeping with judge Woods, just to try to level set this and get the ground stationary in this case, what do you understand their unequal terms, uh, unequal treatment claim to be don't argue what your position is. Can you just describe what you think their claim is? I think they have two claims. One is field used. One is lights on the field. Use their claim is that they, my understanding is that they incurred the cost of appealing the notices of violation and that that cost, uh, shows that they were subject to an unequal treatment of a secular institution. Okay. Even though their actual, in fact, use never changed. Correct. So did the city ever in any way, uh, withdraw those notices or say they weren't going to issue those notices anymore or what gives them legal certainty that they weren't going to be enforced? The city attorney sent a letter to Edgewood and telling them that they would not enforce those notices and invited them to repeal their master plan. Edgewood elected to do that. And the city council approved the repeal of the master plan that put them under the ordinance, the CI district ordinance for those institutions without a master plan. And that meant that they needed to use the conditional use permit process again. That, so this is partly a timing issue. Uh, the, the campus institutional, uh, ordinance was amended, uh, during this process, the amendment provided that, uh, that you would go through the conditional use process for modifications, but that would pertain to the lights, not to the use of the field. Correct. Once the, once the master plan was repealed, they had full use of their field without needing to go through any of it. And the city had formed them or you're representing today that they could use their field for whatever they want. Correct. Given that the master plan is no longer in place. Correct. So no more notices, no more, nothing else ever happened. Correct. Okay. We have to under river of life, look at the accepted zoning criteria. Correct. I think you have said it is the CI district ordinance. It's the CI district ordinance with, for those with master plans. Um, there is different, definitely two tracks. You could have a master plan, which has benefits because you could get 10 years worth of projects, all a past at once without having to go through a conditional use process. Why wouldn't that be the accepted criteria? Zoning criteria, the master plan itself. And I'm sorry, I don't understand the question as opposed to the full CI ordinance. Why wouldn't we just focus in on the master plan being the accepted zoning criteria? It is your honor for the, for the time period where they have the master plan, that is the zone. That is the accepted criteria and the provisions of the ordinance that apply for those institutions that have master plans. And that was very few, right? It was university of Wisconsin and it was Edgewood. And it's anybody else. There was no other institutions that elected to go through the master plan. Memorial high school is not a master plan. Correct. And Memorial high school turning to a little bit on the equal comparators, lights issue. Memorial high school put their lights in, in the 1970s under a far different ordinances and whatnot. They also elected not to do a master plan. So they are not an equal comparator as the lights UW, face the same circumstance as to lights. They had put in lights on their tennis court prior to their master plan becoming effective. So that is why they are not equal comparators when it comes to the lights. Wouldn't they be an equal comparator after the master plan is terminated? If they know, if, if, if you suck for the lights or, or, or Memorial for, I'm talking about Madison. Okay. So after Edgewood repealed their master plan, the university of Wisconsin continued with their master plan. So they still be subject to their master plan. I'm sorry. Then Memorial wasn't subject to a master plan at all. Once Edgewood terminated its master plan and still sought the lights, wouldn't they be they Memorial being the appropriate comparator? They would be except Memorial has already got its lights at that point. What the comparator would be, would be West high school. If West high school wants lights on its football field, they would have to apply and go through the conditional use process. Edgewood, the same thing. Edgewood went through the conditional use process and was, I say denied being generous to Edgewood. What the city actually said is we want you to come back Edgewood. We want you to, it was not a final denial of the lights. It said that the neighbors have brought forth significant evidence of noise and light issues. We want you to do something to try and address those and reapply. Edgewood elected not to do that and instead elected to bring suit. And I don't think there's any evidence that there were any complaints from the residents about Memorial having lights, correct? Correct. There's no evidence of the record of that. There's no evidence of the record of any complaints against UW. There were complaints filed against Edgewood, which is what led to the notices of violation. So is Memorial in an area that's otherwise zoned residential? So for the Memorial prior to the CI district ordinance was not zoned residential. There is some apartments right behind the Memorial. Those were built after Memorial was there and after the lights were there and after. So there's certainly some argument that. Coming to the nuisance. Yes. As opposed to Edgewood. So what is the zone? Is it, is it. It was zoned. It was zoned at the time conservancy, which is an odd zoning ordinance district. I would like to address any questions you have and I'll switch a little bit to the substantial burden argument. So I wanted you simply to reply to the argument that the Edgewood people are making based on the world outreach litigation and the river of life. So and I think to do that and your honor, please direct me if I'm going too far afield. I think the first test is to define what is the religious exercise. At least I'd be delighted if you would do that. I find their definition of the religious exercise and their brief in chief at page 49 and what I Edgewood has never asserted that night football is a religious practice in and of itself. Jokes to one side. I can understand why they would not. Yes. It's religious mission. As I understand, their argument is education and their argument is that night football games helped attract students. That's what I understand. Well, the clearest articulation of it comes from Mr. Elliott's declaration, right? And then I mean, he, and that talks about a sense of community trying to bring parents, alumni, community members together. And I agree with that. I mean, that's, and that's what they rely upon. I agree with that, your honor. And my response to that, if that's the court's question is a couple of things. There's no evidence in this record at all that parents pay any attention as to where an athletic program holds its night games when choosing Edgewood as opposed to its academic or religious programming as the reason for going to the school. In fact, Edgewood hasn't even introduced evidence that field use generally boosts enrollment. And here's an interesting fact that is in the record. It's undisputed that enrollment at Edgewood actually decrease after they made the upgrades to the field in 2015. And that's at record 58 paragraphs, two 26 and two 27. So there's no, there's no tie to field use or night field use actually boosting. You're just seeing these as utterly unrelated, you know, post hoc or go proctor hoc. What about the argument though, that it's necessary to develop the whole person, which is important to the religion. I think that they can develop the whole person through daytime use, through, um, through use on the weekends. But they've argued otherwise under their religion. I'm sorry. They've argued otherwise under their religion. I think they have made some conclusory statements without evidence, but I turned the, so you're saying if I'm understanding that even if we accept fully that their mission is to attract and to educate students in mind, body and soul, as we said this morning, and this is in the brief, um, you can educate people in mind, body and soul, even if the game is in a field across town. I would, your honor, you know, this is the issue of substantial burden, not just any burden. And that's on the, on the initial question of the religious belief. Is that something we can be determining as opposed to a second part of substantial burden? We are not challenging the sincerity of the religious relief of Edgewood, but Edgewood doesn't get to offer speculative expert testimony without foundation. And this case to me is on all fours with Livingston Christian Church, which is a sixth circuit case. And in that case, the, the, um, principal of the school claimed it needed to relocate the school because it's enrollment was dropping and it was losing funds. And in rejecting the substantial burden argument, what the sixth circuit said was there's just insufficient evidence. It said the court noted that the, uh, that the school could have put in declarations of parents saying, you know, I would send my kid to the school, but for its location or whatnot, the only thing it offered was the testimony of the principal saying, I believe I need to relocate to increase enrollment. And as the sixth circuit said, that doesn't, that doesn't do it. So your position is that don't let me put words in your mouth is that we're not in any way questioning the sincerity of their beliefs. Indeed, we'll accept it, but it's too attenuated, even accepting their articulation for that, for that belief or that set of principles to amount to any kind of religious practice or religious conviction for purposes of application of the substantial burden provision of the statute. Correct. Your Honor. I think if we hold, if you, this court holds otherwise than any religious institution can say they're substantially burdened by just saying that my religious beliefs requires me to be exempt from this law. Well, that's where the limiting principles coming, the limiting principle questions coming from, because if there's any, if there's any land use decision that adversely affects a religious institution and it, just if so facto or necessarily becomes a substantial burden claim, then you've emptied the content. You've emptied the provision of any content. Correct. There's nothing that limits it. Correct. That is our argument. Your Honor. I just want to jump and make one or two quick points, which given my limited time left, and this is just to make sure that the court is mindful of certain things that occurred in a reply brief. Edgewood argues in the reply brief that the master plan and the city's ordinance are ambiguous. I want the court to be aware of the fact that in the trial court below, there was no argument at all about ambiguity. It was not in their brief at all. And not only that, but the words ambiguous or ambiguity do not appear in their opening brief to this court. It only appears in a reply brief. So I want the court to note that we believe those arguments are, are waived. I think I addressed the permissive versus restrictive. Cause I think that's an issue that they have really relied upon heavily. I'm sorry. My time is up. Thank you very much for your time and attention. Okay. Thanks to you, Mr. Strut. We'll give you a couple of minutes. We asked you a lot of questions and want to give you, you know, a full opportunity to make some points on rebuttal here. I appreciate it. Your Honor. I'll start with the lights issue until March of 2019. The city agreed that the master plan did not bar any offsite plans. That's how we installed a million dollar field in 2015. That's how we installed conduit for lighting in 2015. That's how we installed a scoreboard in 2015. What ended up happening was after they instructed us to file a lighting application, just like Memorial had done the year prior, we submitted a nearly identical lighting application, submitted it. It was reviewed under Madison general lighting ordinance, 10.085. It met all the requirements. Then there was neighbors that found out that we were going to get an approved light permit at the city's direction. And at our, we, we comply because we had already been burned by their reinterpretation of the master plan on uses. So we made sure we got it actually in writing from the city. We complied with those ordinance requirements. And then they became aware of this new interpretation that any plan, not otherwise identified in the master plan had died. They go through a master plan amendment process. I mean, if you even take that interpretation to its logical extent, Edgewood couldn't replace its boiler, couldn't install a handrail. There was no, you know, no limit to what capital improvements would require a full blown master plan amendment. We are here for the lights and we can get it under the equal terms provision or the substantial burden provision, because they went through an entire individualized process that resulted in the denial. There's own zoning staff proposed the conditions that met the neighbor's interests and concerns that satisfy the, the obligations for us to mitigate any harms by our night activities, which doesn't just include night football, but it includes night community events, night alumni events where we have one field 21 teams, alumni events, and a lot of things we need to do in order to attract students to our school, sustain enrollment and put forth the Cincinnati Dominican values. Okay. Very well. Thanks to council for both parties. Court will take the appeal under advisement.